Deposition of David Hufstetler, taken  on 9/16/2015
courtreporter@mixonreportingservice.com

```
1           IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
2                     VALDOSTA DIVISION
3   IN RE:  ALPHA PROTECTIVE      )
    SERVICES, INC.,               )   Case No. 12-70482
4                                 )   Chapter 7
                    Debtor.       )
5   ---------------------------------------------------
    NEIL C. GORDON, as Trustee )
6   in Bankruptcy for Alpha      )
    Protective Services, Inc., )
7                                 )
                    Plaintiff,    )
8                                 )
         vs.                      )   Adversary Proceeding
9                                 )   No. 14-07017
    AMERICAN PAWN SHOP, INC.,     )
10  as an Initial Transferee      )
    or as Immediate Transferee;)
11  ALPHA CONSULTING ENGINEERS,)
    LLC, f/k/a ALPHA             )
12  CONSTRUCTION & ENGINEERING,)
    LLC f/k/a APS-AEC, LLC, as )
13  Initial Transferee or as      )
    conduit to America Pawn       )
14  Shop, Inc.,                   )
                                  )
15               Defendants.      )
    ---------------------------------------------------
16
17           Deposition of DAVID HUFSTETLER, called
18  by the Debtor, taken pursuant to the Federal Rules
19  of Civil Procedure, was reported by Gail H. Beard,
20  Certified Court Reporter and Notary Public, at the
21  offices of Sellers & Mitchell, 106 Elucid Drive,
22  Thomasville, Georgia, commencing at approximately
23  3:45 p.m. on the 16th day of September 2015 and
24  concluded on the same date.
25
```

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
**courtreporter@mixonreportingservice.com**

```
1                      INDEX TO EXHIBITS
2    Debtor's
     Exhibit        Description              Page No.
3
        1           Complaint                   9
4
        2           Defenses and Responsive     9
5                   Pleadings of American Pawnshop,
                    Inc.
6
        3           Defenses and Responsive     9
7                   Pleadings of American Pawnshop,
                    Inc.
8
        4           Interrogatories            54
9
        5           Cumulative Exhibit of Documents  31
10                  Produced
11      6           Copy of Check 10/12/2012   27
12      7           Pawn Tickets Pages 1-5     46
13      8           Pawn Ticket                51
14      9           Pawn Ticket                51
15
16
17
18
19
20
21
22
23
24
25
```

2

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

```
 1                 A P P E A R A N C E S

 2

     For the Plaintiff,
 3   NEIL C. GORDON, as Trustee in Bankruptcy for Alpha
     Protective Services, Inc.:
 4
                    FIFE M. WHITESIDE, Esquire
 5                  1124 Lockwood Avenue
                    P.O. Box 5383  (31906-5383)
 6                  Columbus, Georgia  31906

 7

     For the Defendants,
 8   AMERICAN PAWN SHOP, INC., as an Initial Transferee
     or as Immediate Transferee; ALPHA CONSULTING
 9   ENGINEERS, LLC, f/k/a ALPHA CONSTRUCTION &
     ENGINEERING, LLC f/k/a APS-AEC, LLC, as Initial
10   Transferee or as conduit to America Pawn Shop, Inc.:

11                  KARL E. OSMUS, Esquire
                    Law Office of David Wolfson
12                  1010 Williams Street
                    P.O. Box 1448  (31601-4038)
13                  Valdosta, Georgia  31603-1448

14

15   -----------------------------------------------------

16   PRELIMINARIES:

17            (Disclosure submitted to all counsel.)

18

19

20

21

22

23

24

25
```

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
**courtreporter@mixonreportingservice.com**

```
 1                    DAVID HUFSTETLER

 2    Having been first duly sworn, was examined and

 3    testified as follows:

 4                    MR. WHITESIDE:  I'm not sort of a big

 5    fan of stipulations.  The rules provide and I'm

 6    satisfied with that.  Do you want to reserve the

 7    right to sign?

 8                    MR. OSMUS:  No.

 9                    MR. WHITESIDE:  We don't have a trial

10    coming up.

11                    MR. OSMUS:  No.

12                    MR. WHITESIDE:  So it's fine with me,

13    we'll do it with that.

14                    EXAMINATION

15                    BY:  MR. WHITESIDE

16      Q.      Okay.  Would you state your name for the

17    record, please.

18      A.      David Hufstetler.

19      Q.      Tell me a little bit about yourself.

20    What do you do?

21      A.      I'm co-owners with a business known as

22    American Pawn, Inc., with my two brothers.

23      Q.      Who are your brothers?

24      A.      Steve Hufstetler and Marty Hufstetler.

25      Q.      Now, where do you live?
```

4

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      Thomasville, Georgia.

2       Q.      Okay.  I'm not planning on coming to

3    visit you, but in case I had to serve you with

4    something, what is your home address?

5       A.      My home address is 2315 Patterson

6    Street, Thomasville, Georgia 31792.  My --

7       Q.      And -- go ahead.

8       A.      The address I would prefer to get served

9    at would be my business 1302 East Jackson Street,

10   Thomasville, Georgia.

11      Q.      And I would do that.  But it's always

12   nice to have a home address.  I'm paying a private

13   investigator right now several hundred dollars to

14   try to track somebody down because they're hiding a

15   home address on me.  And it's just always nice to

16   have a record on that.  But I would not embarrass

17   you on purpose.  So how do you know Jeff Brinson?

18      A.      I first met Jeff roughly the mid-1980s.

19   I was employed by the Thomas County Sheriff's

20   Department-Thomasville Police Department as

21   commander of the drug squad and we were housed in

22   the courthouse.  And he was hired as a deputy, so

23   there was some interaction there.

24      Q.      So you go back -- tell me again the

25   date.  I'm putting the stickers on and I didn't

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    write it down.  How far back?

2        A.      Roughly the mid-'80s, roughly 1985, '86,

3    somewhere in that area.

4        Q.      Now, bearing in mind I'm speaking in the

5    past tense for reasons I suspect are obvious, but

6    were you good friends with him?

7        A.      At the time within the realms of law

8    enforcement, sure, I liked him.

9        Q.      Did that friendship continue up until

10   the time he had started Alpha?

11       A.      Not as closely.  I mean, I knew him.  I

12   just didn't see him nearly as often.

13       Q.      How did you get into finance -- well,

14   first did you make a loan to Brinson?

15       A.      I did.

16       Q.      And a pretty good-sized loan?

17       A.      It was.

18       Q.      Now, how did you get to a point to where

19   you were willing to do that?  Were you still that

20   friendly with him at the time?

21       A.      Friendship didn't enter into it.  I knew

22   him.

23       Q.      Business?

24       A.      It was business, yes, sir.

25       Q.      You expected to make the usual pawnee's

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

```
 1    profit?

 2         A.      Yes, sir.

 3         Q.      Okay.  Have you had any contact with him

 4    since then?

 5         A.      I probably --

 6         Q.      That's a bad question.  Let me start

 7    over again.

 8         A.      Okay.

 9         Q.      Between that loan that you made to him

10    and the time that Alpha filed bankruptcy, did you

11    have any contact with him?

12         A.      I probably have.  I think I reached out

13    to him a time or two just to try to understand what

14    was going on, but it was -- it was somewhat limited.

15    He got to where he was hard to get in touch with.

16    He didn't answer calls.  And as I said to Mr. Osmus,

17    the bulk of me seeing Jeff would be at church.  And

18    that would entail me being in the pew and him up

19    there singing in the choir.  We rarely got to speak.

20         Q.      What church is that?

21         A.      First Baptist Church of Thomasville.

22         Q.      Do you still go there?

23         A.      I do.  Not as often as I should but yes.

24         Q.      None of us go as often as we should.

25         A.      Sir?
```

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                     **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       Q.      None of us go as often as we should.

2       A.      Oh.

3       Q.      Does Brinson still go there?

4       A.      I'm sure he does.  I went Sunday, but

5   they changed the setting and so I can't see the

6   choir as well, so I couldn't say for sure.

7   Probably, he's very -- he seems to be very

8   religious.

9       Q.      As far as you know, he still lives in

10  Columbus -- I mean, in Thomasville?

11      A.      I guess.  I don't know.

12      Q.      Because it's kind of -- you know, I was

13  telling you, I've got a case where I've had to hire

14  a private eye to find the home.  If I had to find

15  Brinson's home address, I would have to do the same

16  thing.

17      A.      Oh, I could find it for you probably.

18  I'm sure I could.

19      Q.      How would you do that?

20      A.      Call the sheriff, he and I are good

21  friends.  And I think he and Jeff, they confide.

22  Yeah, he could find him for you.

23      Q.      I don't have a particular need to get

24  his home address now, but I was using that as an

25  example.  So he's not hiding as far as you know?

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                           **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      A.      Not that I know of.  I doubt it.

2      Q.      Okay.  Let's get started going through

3   the documents.  This is yours.  This is mine.  And

4   the same thing here.  That's yours.  That's yours.

5   And that's yours.  And that's mine.  And the same

6   thing here.  This is yours, that's Karl's, that's

7   the court reporter's and this is mine.

8              First, let's get straight about Exhibits

9   2 and 3.  The answer was filed twice, and you may

10  not know this, your lawyer may, is there a reason

11  why they were filed twice?

12             MR. OSMUS:  It looks to me like my

13  secretary uploaded it twice.  It appears to be the

14  same document.  I don't think there's any --

15             MR. WHITESIDE:  Now, can we sort of

16  stipulate there are no changes between the two?

17             MR. OSMUS:  Sure.

18             MR. WHITESIDE:  So I'm only going to

19  talk about the first one.  Is that okay?

20             MR. OSMUS:  Sure.

21     Q.      Let's go through the complaint.  If you

22  would, Mr. Hufstetler?

23     A.      Yes.

24     Q.      Did I pronounce that right?

25     A.      That's it, uh-huh (positive response).

9

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      Take a look at the second page.  Let's

2     just go through this.  At paragraph 6 I'm going to

3     give you a minute to read that.  That gives the

4     background on the filing of the bankruptcy case.

5          A.      Uh-huh (positive response).

6          Q.      Let's see, have I got -- take a look at

7     the answer.  Oh, I see.  These are not in numerical

8     order according to the complaint.  I've got it.  See

9     if I can find the admissions.  I've got it.  I

10    didn't get it before.  Well, I still don't get it.

11    Is there a --

12               MR. WHITESIDE:  Karl, is there a

13    response to 6?

14               MR. OSMUS:  To your paragraph 6?

15               MR. WHITESIDE:  Yeah.

16               MR. OSMUS:  I think that we would

17    admit your allegations of --

18               MR. WHITESIDE:  Well, I'm just trying

19    to figure your -- I'm trying to understand your

20    answer.

21               MR. OSMUS:  Yeah.

22               MR. WHITESIDE:  I've got it.  Now

23    I've got it.  Okay, 1 through 7, so you admitted 1

24    though 7, so 6 is admitted.  I've got it.  I wasn't

25    figuring the form of your answer out.  Try not to

                                                        10

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   waste time talking about 6 or 7.  Let's talk about

2   8.

3        Q.     If you would read paragraph 8 into the

4   record, Mr. Hufstetler.

5        A.     Me?  Okay.

6        Q.     Yes, sir.

7        A.     "Jeffrey B. (Brinson) is the Chief

8   Executive Officer and sole shareholder of the

9   debtor.  Brinson is himself a debtor in a Chapter 7

10  bankruptcy case which is a pending sub nom In re

11  Brinson, 12-70958."  It's the initial "B.C. Middle

12  District of Georgia 2012.  There has been no grant

13  or denial of discharge in that case so Brinson's

14  automatic stay continues in place.  Trustee, on

15  behalf of Alpha, is a claim holder in that case.

16  Trustee is stay barred to join Brinson as a party to

17  this adversary proceeding."

18       Q.     I notice that's one you denied.  Do you

19  know the reason why you denied that?  Is there

20  anything in particular about 8 that --

21            MR. OSMUS:  I don't think

22  Mr. Hufstetler really has the legal training to be

23  able to understand, especially as far as Bankruptcy

24  Court to understand any of that.

25            (A discussion ensued off the record.)

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        Q.      Okay.  He's right.  I'm not asking you

2    for a legal opinion.  Can you point to anything in

3    paragraph 8 that you know to be incorrect?

4        A.      I -- no, sir, I don't know either way.

5        Q.      Okay.  But you can't look at paragraph 8

6    and tell me, for example, that you know that there's

7    some particular allegation in there that is

8    incorrect?  For example, I've alleged that Jeff B.

9    Brinson is the chief executive officer and sole

10   shareholder of the debtor.  Do you know that that's

11   incorrect?

12       A.      No, sir, I do not.

13       Q.      And you don't know whether he's in

14   bankruptcy or not?

15       A.      I guess he is from the paperwork I've

16   seen, but I don't know from a legal standpoint.

17       Q.      I mean, I'm not asking you to evaluate

18   his case.  I'm just asking if you know he's filed a

19   bankruptcy petition?

20              MR. OSMUS:  I don't think.

21       Q.      If you don't know, that's fine.

22              MR. OSMUS:  Yeah.

23       A.      I don't know.  I guess he has or I

24   wouldn't be getting all this stuff.

25              MR. OSMUS:  But you've never actually

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    seen any of the bankruptcy paperwork yourself?

2         A.    No.

3              MR. OSMUS:  You don't have any

4    personal knowledge of his bankruptcy?

5         A.    No, no.

6         Q.    You don't know what's going on in his

7    bankruptcy?

8         A.    Not really.

9         Q.    That's fine.  And you certainly don't

10   know whether or not my client, the trustee, has

11   filed a claim in that case?  You have no reason to

12   know?

13        A.    No, sir.

14        Q.    All right.  Look at paragraph 9.  All

15   right.  You admit nor deny 9.  Just glance over

16   this.  Do you know anything about the company APS

17   formerly known as APS-AEC, LLC?

18        A.    No, sir.

19        Q.    That's a company for which the CEO we

20   believe was Richard Singletary.  Do you know

21   anything about that?

22        A.    No, sir.

23        Q.    Do you know Mr. Singletary?

24        A.    What's his first name?

25        Q.    Richard, I think.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      I don't believe so.

2       Q.      Okay.  It is Richard, it's in this

3    allegation.

4       A.      I don't know him.

5       Q.      All right.  Do you know Brinson's

6    daughter Kristin?

7       A.      I don't.

8       Q.      You've never met her, never heard of

9    her?

10      A.      I may have over the years.  She's not

11   clicking.  I know he has children.  I don't --

12      Q.      Got it.  All right.  The next paragraph

13   11, where I'm alleging that creditors had moved in

14   on Alpha's bank accounts immediately prior to the

15   bankruptcy case.  You don't know anything about

16   that, do you?

17      A.      No, sir, I do not.

18      Q.      And you don't know anything about the

19   disbursements that were made just prior to filing

20   the bankruptcy case?

21      A.      No, sir.

22      Q.      But I do want to talk to you about 13.

23   How were you paid?

24      A.      I was paid in the form of a cashier's

25   check for $122,875 on April the 9th, 2012.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.        And that's alleged in here further on.

2     Just tell me the background for how you got that

3     check.  Did you demand it?  Or was it offered to you

4     voluntarily?

5          A.        It was offered to me voluntarily.

6          Q.        And that was by who?

7          A.        By Jeff Brinson.

8          Q.        All right.  And you don't remember the

9     bank?  We believe the bank or my recollection is the

10    bank where the check was issued was the Ameris Bank?

11    Do you know?

12         A.        I'll tell you in just a second.

13         Q.        You brought your file with you?

14         A.        Yeah.

15         Q.        Okay.

16                   MR. OSMUS:  Did we not provide a copy

17    of that check?  I thought you provided copies of

18    that check to us.

19                   MR. WHITESIDE:  I have got a copy of

20    it.

21         A.        It's in here.  It was drawn on Ameris

22    Bank.

23         Q.        All right.  And the date on the check?

24         A.        April 9th, 2012.

25         Q.        Can I see that?

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      Sure.

2               MR. WHITESIDE:  May I?

3               MR. OSMUS:  Sure.

4               MR. WHITESIDE:  Thanks.

5       Q.      I think you've already provided it to

6   me.  All right.  And you would agree with me it

7   shows the remitter as Alpha Protective Services?

8       A.      Yes.

9       Q.      So the payment was made by Alpha

10  Protective Services?

11      A.      Yes.

12      Q.      But who is the loan with?

13      A.      The loan?

14      Q.      You made.

15      A.      Jeff Brinson.

16      Q.      So it's Jeff Brinson's loan-- go ahead.

17      A.      What I was going to say from a practical

18  standpoint, I made the loan to Jeff Brinson.

19  However, I do recall when I was going to the bank to

20  get him the funds, he told me to have the check made

21  out to APS-AEC.

22      Q.      Do you have that check?

23      A.      I do.

24      Q.      May I have that check?  I think that's

25  who the check is made to.  We'll circle back when we

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                      **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    get into your documents and then get a correct

2    record on that made.  But I just want to talk about

3    it now.  So you made an advance to the company

4    APS-AEC.  That's kind of the company I was just

5    asking you about involved with Singletary?

6       A.    Okay.

7       Q.    That's why this is an issue in this

8    lawsuit.  So you made the check, the cashier's check

9    payable to APS--AEC and that was $110,000, correct?

10      A.    Yes, that's correct.  That was at Jeff's

11   request.  Now, I also had over -- I don't know how I

12   missed it, he needed -- we negotiated $111,000.  But

13   for whatever reason I had $1,000 cash, which I gave

14   to him, so the entire loan was $111,000.

15      Q.    And then the difference in that and what

16   was paid back was the interest?

17      A.    Correct.

18      Q.    Was there anything else in the

19   difference?  I mean, did Alpha pay you anything back

20   other than the principal and the interest?

21      A.    No, sir.  The entire payback was this

22   cashier's check drawn on Ameris Bank for $122,875.

23      Q.    And we paid in advance of $111,000 --

24      A.    That's correct.

25      Q.    -- was just made payable to this APS

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    entity?

2        A.      Correct.

3        Q.      And do you recall -- I believe the check

4    was issued on April the 9th, the repayment check?

5        A.      That's correct.

6        Q.      Do you recall the circumstances of how

7    Brinson came to offer you that?

8        A.      Yeah, I do.

9        Q.      Tell me.

10       A.      He gave me a call that morning, I

11   believe, and he said the funds he had been expecting

12   on his Federal contractor or contracts had arrived.

13   And he wanted to know how much was it to redeem the

14   loan.  And I quoted him what it was.  I believe it

15   was $124,875 and he said, quote, "Can you do any

16   better than that?"  And so I just knocked $2,000

17   off.

18              I said, "Sure, bring me 122,875, and

19   you'll be fully paid up."

20       Q.      So you weren't fully repaid on your

21   principal and interest?

22       A.      Oh, yeah, I was repaid.

23       Q.      You were repaid your principal but you

24   didn't quite get all your interest back because you

25   knocked 2 grand off?

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    *229-382-8512*

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      A.      Well, that was a negotiated settlement

2   by myself.  And I was more than happy.  It's not

3   that uncommon.  It was a several-day loan.

4      Q.      Which leads me to a good question:  Had

5   you ever done that with him before?

6      A.      No.  I had --

7      Q.      Well, that's a bad question, let me

8   start that again.  Have you ever done a transaction

9   with Brinson where money was advanced to or for the

10  benefit of Alpha or any of the other Brinson's

11  companies?

12     A.      Not to my knowledge.  There were some

13  other transactions.  And I've got the documentation.

14  There was another -- matter of fact, that same day

15  he pawned some firearms that I believe were his

16  personal firearms.  They appeared to be.  They were

17  a mixture of hunting firearms, sporting firearms.

18  And he just defaulted, he just never did pick them

19  up.  So, you know, ownership transferred to American

20  Pawn.  We sold them.

21     Q.      Was there a boat involved in any of your

22  transactions?

23     A.      There was.  This very first transaction

24  there was a boat involved.

25     Q.      What happened to the boat?

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                          **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        A.      I've got it.  He defaulted on it.  He

2   made a subsequent loan and defaulted on it.

3        Q.      My very next question is:  The boat, is

4   it yours or is it subject to a ticket?

5        A.      I don't understand.

6        Q.      Is it collateral for a loan or is it

7   yours?

8        A.      No.  It's so far defaulted.  But if he

9   wanted it back, I'd -- everything is.

10       Q.      I think his trustee might want it back.

11       A.      Do what, now?

12       Q.      His trustee might want it, but he would

13   have to pay you to get it?

14       A.      He would have to pay to get it.  But,

15   honestly, I can get another boat.  If they want it

16   that badly, I'd be glad to sell it at a fair price.

17       Q.      Nobody wants your boat.  But at some

18   point people were looking for the boat.  Where is

19   it?

20       A.      It's in Carrabelle, near Carrabelle.

21       Q.      Florida?

22       A.      Yes.

23       Q.      I'm not coming to get your boat, but I

24   do want to build a complete record on this.  Can you

25   give me a more clear description of where it is

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    other than just Carrabelle?

2         A.      Am I?

3               MR. OSMUS:  I think probably you have

4    to answer that.

5         A.      It's at a boat storage place at Saint

6    James Bay Golf Resort.

7         Q.      Do you know the name of the boat storage

8    place?

9         A.      It belongs to the resort.

10        Q.      Saint James?

11        A.      Golf Resort.

12        Q.      Golf Resort, okay.

13               MR. OSMUS:  But to be clear, this

14   boat was released from this 110,000-dollar pawn

15   transaction to Brinson.

16               MR. WHITESIDE:  It's not my problem.

17   It would be Walter Kelley's problem.  But I will

18   tell you they were looking for that boat at one

19   time.  But if there's another ticket outstanding on

20   it, it's collateral for a loan.

21               MR. OSMUS:  It is.

22               MR. WHITESIDE:  But I don't think

23   Walter knew that.  But they were looking for that

24   boat at one time.

25               MR. OSMUS:  Brinson may just not have

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    wanted to tell them where the boat was.

2                    MR. WHITESIDE:  No, he didn't, he

3    expected to try to get it back.  I get the deal with

4    Brinson.  I understand there's a game running at

5    every angle.  I do get that.

6         Q.    Nobody is coming to get your boat.  Do

7    you use it personally?

8         A.    I do, yeah.  I had -- it's an old story.

9    I had a boat.  I had a boat that I was perfectly

10   satisfied with.  But I decided that should something

11   come up, I didn't want to sell that thing to a third

12   party and them have to deal with bankruptcy and

13   attorneys.  I figured if anyone was going to have to

14   bear that burden, it would be me.

15        Q.    You?

16        A.    Yeah.

17        Q.    So you sold your personal boat?

18        A.    I did, yeah.  And it's okay, but I liked

19   my other boat better, quite frankly.

20                    MR. OSMUS:  And to say if they wanted

21   your boat, they are going to have to sue you for it.

22                    THE WITNESS:  Yeah.

23        Q.    Nobody is going to come get your boat.

24   But I just know at one point people wanted to know

25   where it was.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        A.        Right.

2        Q.        So now you mentioned that Brinson had

3    put up some hunting guns and stuff on a personal

4    pawn ticket that he didn't redeem?

5        A.        That's correct.

6        Q.        Was any of the other collateral involved

7    in the Alpha loans that went unredeemed other than

8    the boat?

9        A.        No, sir.  There was not, no.  He picked

10   it all up, I believe, the day that he paid me.

11       Q.        All right.  But I was going to ask you.

12   He didn't pick the boat up but the boat was redeemed

13   from?

14       A.        (Witness nods head affirmatively.)

15       Q.        So that was his boat at that point?

16       A.        It was.

17       Q.        He went back and borrowed more on it?

18       A.        He did.  Roughly, without looking at my

19   notes, about April the 30th.  What I got from him

20   when he picked up everything else, he just

21   offhandedly said, "David, do you mind if it stays

22   here?"

23             I said, "Sure, I don't mind and I've

24   got" --

25       Q.        He didn't want anybody to know where it

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   was.

2      A.      Sir?

3      Q.      He didn't want anybody to know where it

4   was.

5      A.      Well, I don't -- but, anyway, it didn't

6   bother me.  And I just, you know, put him on notice

7   that if it's not on pawn, that he can leave it there

8   but it's not covered by my insurance.  As long as

9   it's on pawn, it's covered.  And so he was fine with

10  that.  I said, "Sure, leave it."

11           And then about two weeks later, he

12  showed up, "Hey, by the way, can I redo the loan on

13  that boat."

14           And I'm like, "Sure, fine with me."

15     Q.      How much did you advance him on that

16  one?

17     A.      I'd say $15,000.

18     Q.      And you flipped that ticket two or three

19  times?

20     A.      He flipped it one time.  It was like six

21  months later.  By Georgia law, ownership should

22  transfer after 40 days, but we try very hard for

23  people to get their stuff back.  So 60 days is

24  automatic.  And on the boat, I don't want to have to

25  fool with selling this thing.

24

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1                        So it's like five months later I called

2       Jeff, "I know you like the boat, I guess you do, but

3       you're going to have to do something."  And he came

4       in and made a payment and we flipped the loan, as

5       you say.  And he just never did -- that's been,

6       golly, two years ago.

7            Q.        So let me summarize, that transaction,

8       when you got the money back, the cashier's check

9       that we just talked about --

10           A.        Uh-huh (positive response).

11           Q.        -- that satisfied the ticket on the boat

12      and the other guns and stuff that's mentioned in the

13      documents?

14           A.        Not the guns but the tractors and the --

15           Q.        What about the guns?

16           A.        That was a separate transaction.

17           Q.        Oh, really?

18           A.        Yeah.

19           Q.        So who did you -- I mean, who did you

20      advance money to on the guns?

21           A.        Jeff, yeah.

22           Q.        So some of these tickets were not

23      redeemed?  We just have to --

24           A.        Yeah, that ticket was -- it's like maybe

25      4500.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                      **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      Yeah, let's don't do that now.  Let's

2     come back to that.  I want to try and do this

3     pyramid fashion, get the important stuff first.  We

4     can figure that out.  So now, is there any other

5     money that you got from Brinson or AEC or Alpha

6     directly or indirectly for any reason?

7          A.      No, sir, huh-uh (negative response).

8          Q.      Except, I guess, when he flipped the

9     ticket on the boat, you got a little bit?

10         A.      Yeah.  He came in.  I told him $5,000.

11    For some reason he brought me a check for

12    $4997 and change.

13         Q.      Do you know what kind of check that was?

14    Was that an Alpha check?

15         A.      No.  It probably -- I don't know I would

16    have taken an Alpha check.  It probably would have

17    been a certified bank check.

18         Q.      Do you have that in here?

19         A.      I don't think so.  I could probably

20    track it down, though.  I'll check.  I bet you I

21    don't, but I could get it.

22         Q.      Somewhere around here I've got an old

23    beat-up brief case that has my notepad in it.  While

24    you're looking, do you have copies of the pawn

25    tickets for that transaction in there too?

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      Yes, I do.  Yeah.

2       Q.      Yeah.

3       A.      I don't -- I don't have that.  No, I do.

4    Yeah, I do.  Yeah, I do.

5       Q.      What is that?

6       A.      The check on the payment he made.

7                  MR. WHITESIDE:  Is that all right?

8    Mind if I look at it?

9                  MR. OSMUS:  Sure, sure.

10      Q.      This is from Alpha too.  Okay.  Now,

11   this is going to get a little hinkie (sic).  I'm

12   going to come back at a break and straighten this

13   out, but I'm going to put this in the middle of the

14   table, and then we'll mark it and get it copied and

15   give it to you because I don't think I have this.

16   This is going to be marked as Exhibit 6.

17                  I know we're only up to 4, but I've got

18   a 5 I need to mark too.  So this is going to be

19   marked as Exhibit 6.  I'm not going to mar up the

20   front of your document, but I do need to put a

21   sticker on the back.  Is that okay?

22      A.      Sure.

23      Q.      You would agree with me that this is a

24   check for $4997.63 showing as a remitter Alpha

25   Protective Services?

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      That's correct.

2       Q.      And it's from what bank?

3       A.      Bank of America.

4       Q.      Bank of America?

5       A.      Uh-huh (positive response).

6       Q.      This says -- read me the language on the

7  bottom and explain to me what that means.

8       A.      That's notes to myself.  I had typed it

9  up originally as a buy where American Pawn was the

10 owner of the boat with a pre-agreed-upon amount that

11 he could repurchase it for within a certain period

12 of time.

13              When he came in to flip it, as you say,

14 I converted it to a loan, a pawn, because you can't

15 accept a payment on a -- and showed that payment.

16 And basically we refinanced it for the original

17 $15,000.  And what it did, it allowed ownership to

18 stay with Jeff for another period of time.

19      Q.      That's subject to your pawn?

20      A.      Subject to the -- yeah, the pawn loans.

21 Again, Georgia state laws, 40 days.

22      Q.      Forty and sixty you told me?

23      A.      We do 60 and on something like this, you

24 know.

25      Q.      All right.  I want to get this straight,

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    *229-382-8512*

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    now.  He redeemed the boat from the original pawn

2    transaction?

3         A.    Uh-huh (positive response).

4         Q.    When he paid the 122 or whatever it was?

5         A.    Yes.

6         Q.    All right.  So at that point it was

7    lien-free.  He told you to keep it and you then --

8    did you buy it from him or did you let him borrow on

9    it?

10         A.    Now, on that day it was his property.

11         Q.    I know that, but subsequent to that?

12         A.    He came back, I believe it was April the

13    30th, and he wanted to redo the loan.  But I typed

14    it up as a buy where I was actually purchasing it so

15    ownership would transfer immediately.

16         Q.    Tell me, again, how much did you pay?

17         A.    $15,000.

18         Q.    $15,000, okay.  So, then, he came back

19    in and paid you that?

20         A.    In November some months later.  But,

21    again, I'd rather have the money than the

22    collateral.

23         Q.    Right.  And then you redid it as a loan

24    then?

25         A.    Correct.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    *229-382-8512*

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        Q.      And then subsequent to that, he never

2   redeemed that ticket?

3        A.      That's correct.

4        Q.      I've got it.  Sit this right in the

5   middle of the table.  Did you take any other money

6   for any reason from Brinson or Alpha?

7        A.      No, sir.

8        Q.      There were no other loans?

9        A.      No other loan.

10       Q.      You said that the guns were on a

11  separate ticket?

12       A.      They were.  Did you want to --

13       Q.      Yeah, let's do that now.  And that --

14       A.      Duplicates.

15       Q.      Okay.  Now, this is another ticket to

16  Brinson for 6500 and that's not included in the

17  one -- this is not part of the 111?

18       A.      No, sir, it is not.

19       Q.      Okay.  I think I've already got --

20               MR. WHITESIDE:  Karl, do I already

21  have this?

22               MR. OSMUS:  I think you do.

23               MR. WHITESIDE:  I'm not going to copy

24  it.

25               MR. OSMUS:  That's the pawn ticket

**Mixon Reporting Service, Inc.**

**Albany - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1 for the firearms to Brinson personally.

2     MR. WHITESIDE:  Let me get those back

3 from her and let's check.  May we go off the record

4 a minute?

5     MR. OSMUS:  Sure, sure.

6     MR. WHITESIDE:  Thanks.

7    (A discussion ensued off the record.)

8     MR. WHITESIDE:  This is going to be

9 my 5.  That's why I skipped to 6.  This is yours,

10 okay.  I owe you one.

11  Q. Let's go through this document.  Exhibit

12 5 is a cumulative exhibit of the documents that were

13 produced in response to my document request.  Set

14 yours down and let me see if you can find -- so we

15 don't create a lot of redundancy here, see if you

16 can find the ticket on guns.

17    Now, I do see tickets on guns but it's

18 for a different amount.  Look at loan number ending

19 4824.  Look in this packet I just gave you.

20  A. I've got it.

21  Q. Yeah, see if you can find it in the

22 packet I just gave you, though.  I'm trying to

23 figure out did I -- no, I didn't give you a packet?

24 I gave you one of these, didn't I?

25  A. Yeah, I think you did.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**     *229-382-8512*

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      Q.      See if you can find --

2              MR. OSMUS:  Exhibit 5.

3      Q.      Yeah, Exhibit 5, 4824.

4      A.      I've got it here.

5      Q.      I'm trying to figure out how -- okay,

6  that's good, so this is part of what you've already

7  supplied me?  I've got it.  So that's different from

8  the one we were talking about a minute ago?

9      A.      That's correct.

10      Q.      Okay.  Yeah, these are the Glocks that

11  he issued his officers.  Okay.  I've got it.  It's

12  the 110,000-dollar.  Here's the $122,875.  Here's

13  the 110,000.  Did you pawn a truck too?

14      A.      Yes, sir.  There were three title loans

15  that are included in this original loan for

16  $111,000.  Part of it was three titles to two 2011

17  Dodge pickups and one 2012 Dodge pickup.

18      Q.      Yeah.  Let's get the documents straight

19  on that.  Are there tickets on that?

20      A.      Yes.  Are you --

21      Q.      I see.  It's the very first thing.  I've

22  got it.  For the record, that's the very first page

23  of Exhibit 5.  Let's go through here.  So we have

24  right at the top of that packet -- I'm referring now

25  to Exhibit 5, cumulative Exhibit 5, $65,000 secured

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1  by three cars.  We just talked about that.  46,000

2  secured by two tractors and a boat that we've

3  already talked about.  Oh, I guess this continues

4  over to the next page; is that right?

5      A.      It does.

6      Q.      46,000 is also secured by an Anderson

7  29-foot dual tandem axle.  I guess is that a

8  trailer?  That's a trailer?

9      A.      Correct.

10      Q.      And then it says here, "Other:  Within

11  30 days:  APS will sell back all for 51,750."

12  What's that mean?

13      A.      That was the redemption amount.

14      Q.      I see.  Is that standard for a pawn

15  ticket?

16      A.      It's up to the pawn broker.  On larger

17  amounts, I'm more comfortable typing it up as a

18  purchase.

19      Q.      Was this a purchase?

20      A.      That was a purchase with a

21  pre-agreed-upon amount that he could buy back.

22      Q.      So to keep the record clear on this:

23  This is the 46,000-dollar transaction, loan number

24  ending in 7681.  Your testimony is that that is

25  actually not a pawn ticket, that's a loan?

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1          A.          That's correct.

2          Q.          I mean, not a loan, it's a sale?

3          A.          That's a buy, a purchase by me from him.

4          Q.          With the right to redeem it for $51,750?

5          A.          Correct.

6          Q.          I see.  So now what is 46,000?  What is

7     the next 46,000?

8          A.          If you'll notice at the top, that's page

9     2 of 2.  That amount was used to purchase the two

10    tractors, the boat, and the dual tandem axle trailer

11    was what the tractor actually loaded on.

12         Q.          Okay.  I've got a bunch of pages here

13    that say 46,000 on it, more than just two.  Let's

14    try to go through this.  If I'm confused, the record

15    will be more confused.

16                      MR. OSMUS:  Do you want to refer to

17    loan numbers?

18                      MR. WHITESIDE:  I did.  I was just

19    about to, sorry.  I was just about to.

20         Q.          All right.  The second page of Exhibit 5

21    is loan number ending 7681, 46,000?

22         A.          Uh-huh (positive response).

23         Q.          And the second page of that is page 2 of

24    2 and that has the same numbers on it, 7681.  That

25    says 46,000.  Then the next page starts over and

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    there is a one, two, and three on that and that's

2    3538, but that's also 46,000.

3        A.      That's correct.  I can explain that.

4        Q.      Yeah, tell me about that.

5        A.      That was when, again, like the other

6    instance I believe we talked about, it was typed up

7    originally as a buy with a pre-agreed-upon amount to

8    him to repurchase it or redeem it.  So when those

9    funds were actually received, the loan was voided

10   and it was changed to a pawn where I could actually

11   show, you know, the moneys coming back in.  You

12   can't do that if you type it up as a buy.

13            So the original buy, which ends in

14   27681, when the funds came in, that transaction was

15   voided and re-entered as a pawn.  And then shown as

16   being redeemed with $51,000 being applied to that.

17       Q.      Okay.  But now this is dated

18   4/16/2012 --

19       A.      Correct.

20       Q.      -- which was after you got paid?

21       A.      That's correct, yeah.  The money was

22   deposited just a matter of convenience's sake, just,

23   you know, actually typing it up on the computer.

24       Q.      Did you lend him more money on the 16th?

25       A.      No, sir.

35

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        Q.        Okay.  Now I'm just as -- this is clear

2    as mud to me.  So tell me one more time.  Please

3    bear with my ignorance of your industry, because I

4    don't know anything about pawns.

5        A.        That's no problem.

6        Q.        Tell me what the second set of documents

7    1 and 2 for 3538 that's dated April 16th, '12, what

8    does this mean?

9        A.        That was me actually documenting the

10    transaction, his repayment.  When the funds were

11    actually delivered to me on April the 9th, which

12    were then deposited into the bank.  For, you know,

13    record keeping and accounting purposes, I had to

14    show it as a pawn.  So I've been paid, so I

15    converted it to a loan, which allows me to show the

16    money being redeemed.  The moneys were received on

17    April the 9th, but I didn't get around to doing that

18    until April the 16th.

19        Q.        I guess I sort of understand that, but

20    if I total up 46 and 65, that gives me the 111 --

21        A.        Correct.

22        Q.        -- which was the advance?  Okay.  Now,

23    let's keep going.  Now, there is another pair of

24    tickets that have 46,000 on it that's done April the

25    4th, which is the same date as the first one?

**Mixon Reporting Service, Inc.**

**Albany - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          A.      That's a duplicate.  For some reason, I

2     must have just or somebody put two copies of the

3     same thing.  If you look back at the first 2781,

4     you'll see it's identical.

5          Q.      Yeah, the collateral is all the same and

6     the amount is the same?

7          A.      Yeah.

8          Q.      Okay, got it.  Let's flip over to the

9     next page.  Here's 1 and 2, 2/11 for $810.  That for

10    the record ends in 4825.

11         A.      That is where I was purchasing their

12    Glock handguns.  That would be related to the

13    document on the next page.  It is numbered 24824.

14         Q.      Yeah.

15         A.      That one, that transaction contains 16

16    firearms and my software will only allow 16 items of

17    any sort to be entered.  So when I hit the end of

18    that, those 16 firearms, I had to start a new

19    transaction for, I believe it's six firearms.

20         Q.      You've got six pages here?

21         A.      Yeah.

22         Q.      Page 1 of 6 through 6 of 6, all of them

23    say $4320.

24         A.      That's the one that should have a total

25    of 16 items.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                          **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1        Q.      It does.

2        A.      Okay.

3        Q.      The sixth page has a 16th Glock on it?

4        A.      Right.

5        Q.      Was this a purchase?

6        A.      That, yeah, I was buying them.

7        Q.      And he never brought them back?

8        A.      There was never any intention for him to

9    buy them back.

10        Q.      You wanted to buy them?  He wanted you

11    to buy them?

12        A.      He wanted to sell them.  He approached

13    me.

14        Q.      You gave him $4320?

15        A.      That's not the entirety of it.  There

16    was this continuation, which it says loan number but

17    it's a purchase number 24825.  That's another six of

18    those firearms.  There were many more than that

19    involved.

20        Q.      Yeah.  You've got a great big long list

21    here.

22        A.      That list is a continuation.  That's

23    simply an easier method for me to record the

24    purchasing, the acquiring, and the disposing of

25    these firearms.  When I go into the program that is,

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    quote, add inventory, in this case, where everything

2    is identical except for the serial numbers, once I

3    type in the description of one of those Glock

4    handguns, then my computer will give me the option

5    of do you want to enter another with only a

6    different serial number.

7        Q.      Got you.

8        A.      So it's much quicker.

9        Q.      Now, the document I'm referring to is

10   part of Exhibit 5, which is captioned at the top

11   "received inventory."  And it's hard for me to make

12   the dates out, but it looks like 2/4/11 to 2/28/11,

13   so this is a list of the guns you bought?

14       A.      That would be a list of any item that we

15   bought during that date period.

16       Q.      Including his?

17       A.      Including his.

18       Q.      Okay.

19       A.      The ones that didn't involve him, I

20   blacked them out.

21       Q.      Okay.  But all those that are not

22   blacked out, you bought from him?

23       A.      That's correct.

24       Q.      If you didn't pay him $4200 for them,

25   what did pay him for that?

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        A.        I paid him $4320 plus $810.  I'd have to

2    do some math.  If you've got a minute, I will.

3        Q.        Where are you getting the rest of the

4    numbers, though, the rest of the amounts for what

5    you paid him for those guns?  Is there a document in

6    here that shows other amounts paid to him?

7        A.        Yeah, the two amounts that I just quoted

8    4320.

9        Q.        And 810?

10       A.        That's on 24824.

11       Q.        Yeah.  And I got that.  We found those.

12   But is there another document that shows the

13   additional moneys you paid him?

14       A.        Yeah.  The $810 that I referred to is on

15   the document 24825.

16       Q.        I found that.

17       A.        The remainder is on the documents that

18   you just described.

19       Q.        This great big long list?

20       A.        Yes.  And it has the individual amount

21   of each item purchased.  It does not have it

22   tallied.

23       Q.        So if I add it up, if I or somebody

24   added up all of these numbers that say "extended

25   price," that would give the total that you paid for

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                              229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    these guns?

2         A.     That's correct.

3         Q.     I understand.  The next in order in

4    Exhibit 5 is something called "sales receipt

5    166730."  And this looks like musical instruments.

6    Percussion mallets?

7         A.     It is.  In the notice that I got, it

8    requested, the way I read it, any and all documents

9    involving Jeff Brinson within a certain time period.

10        Q.     Got it.

11        A.     And so that's what I did.  He probably

12   bought something for his children for high school

13   band, I would guess.

14        Q.     It seems like I remember in some of the

15   material that I read that his children did band.

16   The next is a couple of gun items?

17        A.     Yes.

18        Q.     A couple holsters?

19        A.     Yes.

20        Q.     That end it 6917?

21        A.     Yes.

22        Q.     End in 3826, this looks like several

23   firearms that he bought?

24        A.     Yes.  Those were probably riot-type

25   shotguns.

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        Q.        So-called tactical shotguns?

2        A.        Yeah, there you go.  The first two and

3    the second two are Beretta handguns.

4        Q.        Do you like Beretta?

5        A.        Sir?

6        Q.        Do you like Beretta?

7        A.        Honestly, I'm not big into guns, other

8    than what you can sell them for and make some money

9    off of.

10        Q.        Really?

11        A.        I was in law enforcement for a long

12    time.  I just never -- it just wasn't a big deal to

13    me.

14        Q.        And then the next item here, it looks

15    like an e-mail with an attachment to it from Gina

16    Brogren?

17        A.        Yes, sir.

18        Q.        Who is she?  Do you know?

19        A.        She's administrative assistant at the

20    bank.  She's one of, I guess you'd say, a go-to

21    person when I need something.

22        Q.        Which bank?

23        A.        Thomasville National Bank.

24        Q.        Got it.  TN Bank, got it.

25        A.        TNBT.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1       Q.       I see it on the bottom now.  Now, why is

2    this being -- I mean, what's the point of the

3    e-mail?

4       A.       Somebody asked for documentation of the

5    moneys that, you know, transferred.  And I just

6    E-mailed her and she e-mailed me an attachment.

7       Q.       This to aps@rosenet.  Who is that?

8       A.       That's me, that's my business e-mail.

9       Q.       So she e-mailed that to you?

10      A.       Correct, uh-huh (positive response).

11      Q.       The next page is 2 of 2.  This is the

12   deposit ticket.  I mean, I'm sorry, this is where

13   you bought the ticket to make the advance?

14      A.       Yes, sir.

15      Q.       I mean, bought the check to make the

16   advance, got it.  And that's part of the same e-mail

17   it looks like?

18      A.       Probably.

19      Q.       It says page 1?

20      A.       Yeah.

21      Q.       Page 2 of 2.  And then you've got the

22   NADA on one of the trucks?

23      A.       Uh-huh (positive response).

24      Q.       This is the next item that we're talking

25   about in this cumulative Exhibit 5.  It says,

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
**courtreporter@mixonreportingservice.com**

1    "Summary with NADA values, NADA used car guide

2    Tuesday, April, 3rd, 2012."  It's the NADA on a 2011

3    Dodge truck with a copy of the title certificate

4    attached.  Your title lists with APS-AEC?

5         A.     That's correct.

6         Q.     There's another title certificate

7    attached.  This is on a -- gosh, what is this?

8                    MR. OSMUS:  It's a boat.

9         Q.     Sea Hunt boat, yeah, the boat we talked

10   about.

11                   MR. OSMUS:  Florida has an actual

12   title unlike Georgia.

13                   MR. WHITESIDE:  Got it.  Boats are

14   never titled in Georgia?

15                   MR. OSMUS:  They are not.

16                   MR. WHITESIDE:  I had that

17   conversation the other day and neither one of us

18   knew.

19                   THE WITNESS:  They should be.

20                   MR. OSMUS:  They disappear

21   frequently.

22                   MR. WHITESIDE:  They do.  That's

23   what --

24                   THE WITNESS:  Seems to have happened

25   here.

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      All right.  The next is an NADA on a

2    2011 Dodge truck followed by GreenSouth Equipment,

3    it looks like a purchase order.  Yeah, that's what

4    it is.  Why do you have the purchase order?  Did you

5    finance the purchase of those?

6          A.      No, sir.  This was -- they, you know,

7    whoever -- Mr. Osmus or whoever wanted any and all

8    documentations.  This would have been part of my

9    original due diligence to see what things are

10   working and not working and who owns them and who

11   doesn't own them.  So I included them.

12         Q.      Okay.  Chrysler Group -- there are three

13   of those, I believe, for the record, three of what

14   appears to be equipment invoice purchase orders.

15   And for the record, those are related to a new JD

16   5045, what is that, John Deere tractor?

17         A.      (Witness nods head affirmatively.)

18         Q.      The next one is a 2008 JD John Deer

19   5065E.  The next one is a JD 512 loader.  And then

20   that's followed by a certificate of title to a 3500

21   Mega cab pickup.

22                 MR. OSMUS:  That's actually a

23   certificate of origin.

24                 MR. WHITESIDE:  It is, isn't it?

25                 MR. OSMUS:  Yeah.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1                    MR. WHITESIDE:  You're right.  Thank

2     you for the correction.

3          Q.     All of that is part of the same due

4     diligence to determine the value.

5          A.     Correct.

6          Q.     Who's is this next page here APS-AEC,

7     LLC?

8          A.     I believe it's the back of this

9     certificate of origin that you just referred to.

10         Q.     I see.  All of these title certificates

11    are in the name of APS-AEC, are they not?

12         A.     All except for the boat.

13         Q.     Yeah, the boat, okay.  Let's look at the

14    boat.  Let's see who that's titled to.  That's

15    titled to Brinson individually.  And that completes

16    them.  So we now know what we don't have.  So in

17    this set we don't have Exhibit 6 and I don't have

18    the pawn ticket on the personal guns.  So we're

19    going to -- I need for you to fish that out and let

20    me get that in the record.  You had it just a minute

21    ago, and I should have had you lay it aside.

22         A.     Yeah, that's it.

23                    MR. WHITESIDE:  And that's going to

24    be my Exhibit 7.  Nobody get freaked out because the

25    color is changing okay?  Blue is fine.  It don't

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   matter.  Blue/yellow, do you mind?

2                   MR. OSMUS:  Nope.

3                   MR. WHITESIDE:  That's good.  I've

4   got to find a place to put it where I'm not going to

5   block anything, though.  It's tough here.  I'm going

6   to put it right up here in the upper.

7                   MR. OSMUS:  Do you want to make

8   copies of it first?

9                   MR. WHITESIDE:  Yeah, we'd better do

10  that.  Can you get her to make copies of these too?

11              (A break was taken.)

12                  MR. WHITESIDE:  Just so you know, we

13  weren't talking about your case.  We were talking

14  about fly fishing while you were gone.  While I'm

15  doing this, I'm sorting through these to assemble

16  these to put them in the right order.

17      Q.      You don't have any other tickets on

18  other transactions with Brinson or with Alpha that

19  are not part of the Exhibit 5 we talked about?

20      A.      Not part of what, now?

21      Q.      Not part of the big exhibit, Exhibit 5

22  we talked about, you know, that we went through and

23  looked at the boat and the tractors and the cars

24  and --

25                  MR. OSMUS:  5 is what you produced

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                                 229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1  already.

2               MR. WHITESIDE:  Yeah.

3               MR. OSMUS:  That's what you sent me

4  and I sent him.

5               MR. WHITESIDE:  Yeah.

6        A.     No, that's it.  Uh-huh (positive

7  response).

8        Q.     So that plus what we are looking at now

9  is everything that relates to Brinson or Alpha, all

10  the tickets that relate to Brinson or Alpha?

11        A.     Correct, yeah.  Now, y'all specified

12  during that roughly two-year time period there's

13  some minor stuff in years earlier, little purchases

14  and stuff.

15        Q.     That is true.  This is one set.  Okay.

16  Now, Exhibit 6 is the check that we talked about

17  where Alpha is the remitter $4997.63 on the Bank of

18  America.  And Exhibit 7 we didn't copy the back

19  side, but I'm not worried about that.  But Exhibit 7

20  is the pawn ticket.  And this pawn ticket Exhibit 7

21  relates to the check that is Exhibit 6, correct?  Is

22  this what -- did this check at 6 pay off that ticket

23  at 7?

24        A.     No, sir.

25        Q.     All right.  Let's get that straight.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              229-382-8512

Deposition of David Hufstetler, taken on 9/16/2015
courtreporter@mixonreportingservice.com

1    Tell me about that.

2         A.      That's the check I don't know if you

3    recall when he flipped the ticket on the boat.

4         Q.      Yeah.

5         A.      And I want to say it's in November.  No,

6    excuse me, it was in October.

7         Q.      I was confused.  Do you have -- Exhibit

8    7, then, these are the guns that he bought?

9                 MR. OSMUS:  Gun.

10        A.      These are the guns that he pawned.

11        Q.      Pawned?

12        A.      And never redeemed.

13        Q.      Okay, I've got you.  So you ended up

14   with these guns?

15        A.      That's correct.

16        Q.      You don't have a check to show where

17   this money went, the money that you advanced on this

18   ticket, do you?

19        A.      On Exhibit 7?

20        Q.      Yeah.

21        A.      No, sir, I would have handed him cash

22   and that would have been --

23        Q.      Okay.  All right.

24                MR. WHITESIDE:  Hand that back, you

25   keep that one.  Put one in the middle of the table

**Mixon Reporting Service, Inc.**

Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    to give to the court reporter in a minute.  That's

2    for Karl and this is for me.  Madam court reporter,

3    you will get those in the middle of the table.

4         Q.     All right, do you have your tickets that

5    relate to this check, the 4997?  Is there another

6    ticket?  You already supplied that to me?

7         A.     Give me a second.

8         Q.     See if we can get that.

9         A.     My only question is, I don't think it

10   fell within that timeframe that was requested so --

11        Q.     You may not have it?

12        A.     -- might not have it.

13        Q.     Now, this check is October 12th, 2012.

14        A.     I did have it.

15        Q.     Let's take a look at that.

16        A.     This goes along with it also.  It was

17   originally, as I said, typed up as a purchase.  And

18   then when he came in to make a payment or flip it,

19   as you said, it was converted to a pawn so that that

20   payment reflected --

21        Q.     There's only two of these?  Only two of

22   these?

23        A.     Should be.  Let me -- can I look at them

24   again?

25        Q.     Yeah, make sure.

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      Yes, sir, there's only two.

2               MR. WHITESIDE:  This is going to be 8

3    and 9.  Don't copy them now, let's try to get -- how

4    late is she going to be able to stay?  Do you know?

5               MR. OSMUS:  I don't know.

6               MR. WHITESIDE:  You don't know, okay.

7    I want to try to finish up today if we can.

8       Q.      Now, between the documents we've talked

9    about, the pawn tickets and the checks you'd already

10   supplied, the check here from Alpha that's post

11   petition that I'd not seen, these two tickets here,

12   which you issued cash for, right?

13      A.      Yes.

14      Q.      Okay.  Have we talked about all the

15   transactions involving Brinson or Alpha or APS?

16      A.      Everything within that timeframe that

17   y'all asked about.

18      Q.      Right, that's all I'm asking about.

19      A.      Yes, sir, correct.

20      Q.      Let's skip through the answer -- the

21   complaint and answer.  I do realize the hour is

22   getting late.  If you would get this document in

23   front of you, the one that says complaint.  You

24   should still have that.

25               MR. OSMUS:  Exhibit 1.

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                      **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      Q.      It's right there.

2      A.      I do.

3      Q.      Okay.  Did Brinson tell you what he was

4   going to use the money for?

5      A.      He -- not -- I don't believe he did

6   initially.  But the day of the loan he did for sure.

7      Q.      What did he tell you?

8      A.      He says it's to cover some payroll

9   checks.  Matter of fact, he called me, I want to say

10   it was like 10:15 or 10:30.  And I was on the way to

11   the bank anyway to tend to business.  And he told me

12   he needed the funds at his bank by 11:00 a.m.

13   because they were going to return a substantial

14   number of payroll checks.

15              And I said, "Jeff, I didn't know I was

16   under this timeframe."  And I said, "I know your

17   bankers.  Can I talk to them and tell them the money

18   is on the way?"  And I don't remember what he said

19   but nevertheless it was clear that he needed the

20   money by 11:00 a.m.

21              So, I mean, I was already comfortable

22   with the collateral.  I already had it in my

23   possession.  So I went to the bank and I got a

24   cashier's check for $110,000 and drove straight to I

25   think it was Ameris Bank.

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1     And he was standing there with his two

2 bankers Jack Cannady, that I've known forever, and

3 the other guy Ronnie Marchant.  And it was

4 pushing -- it was probably 5 minutes to 11:00 and I

5 could tell something was going on, everybody was not

6 happy.

7     And I handed them the check and says,

8 "Here we go and here's the other $1,000 cash."  And

9 it appeared like everything was okay.  I was of --

10 he told me had he not had the funds in their hands

11 by 11:00 a.m., they were going to return all those

12 payroll checks.  And I can only imagine what kind of

13 confusion that would have caused.

14   Q.  It was an unusual situation?

15   A.  His was.  Well, let me back up.  I did a

16 security service one time, actual Federal contract,

17 and they don't care when your payroll is due.  It's

18 not common for them to be late.

19   Q.  Yeah.  And what I meant, it was an

20 unusual situation for you to be making that kind of

21 loan?

22   A.  You know, the size of the loan

23 considering the collateral was not that unusual.

24 The biggest thing that was unusual was for him to

25 put me under the gun, the 30 minutes.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**        **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      Well, that's what I meant, the

2     circumstance unusual?

3          A.      Yeah.

4          Q.      Had never made a payroll loan with you

5     before?

6          A.      No, sir, huh-uh (negative response).

7          Q.      Did you consider yourself to be friends

8     with Brinson at the time you made the loan?

9          A.      Sure, casual friends.  I mean, I'm

10    friendly with almost everybody I know.

11         Q.      Okay.  We are rounding in the

12    homestretch.  These are the interrogatories.  I'm

13    just going to kind of speed through those.  Here you

14    go.  This one is yours.  This is Exhibit 4 and this

15    is the interrogatories.  You didn't file formal

16    responses to the interrogatories.  I'm not fussing

17    at you about that.  We can do this in this

18    deposition just as well.  But we do need to go

19    through this.

20              The first one is:  Do you know of

21    anybody else -- we've talked about a good number of

22    people, the two bankers, Brinson and maybe -- did we

23    talk about Ms. Brack, did you have anything to do

24    with her?

25         A.      Who is that, now?

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.        April Brack.

2          A.        Only -- I didn't even know her.  But she

3     came into the pawn shop maybe a year ago making

4     inquiries about the boat.

5          Q.        Yeah, people were looking for the boat.

6          A.        Apparently, she had acquired a loan that

7     was based on the boat and she had some cash on

8     deposit, several thousand dollars.

9          Q.        Where?

10         A.        At the place that loaned her the money.

11    I believe it was a --

12         Q.        Federal Credit, MEGFCU.

13         A.        You know, I was as nice to her as I

14    could be.  And I, again, got my attorney involved

15    and ran it by him.  And he said, you know -- I said,

16    "William, I want to do the right thing."

17                   And he said, "You're fine."

18                   So I told her, I said, "Ma'am, I just

19    can't -- I can't do anything."  I haven't heard

20    anything back from her.  Apparently, the creditor

21    was satisfied.  She, obviously, was making the

22    payments or I assume I would have heard from them.

23         Q.        I took $113,000 from them.

24         A.        Well, but, actually, and I researched

25    this and I had William Clark verify it, she had

**Deposition of David Hufstetler, taken on 9/16/2015**
**courtreporter@mixonreportingservice.com**

1    three separate loans.  The first one was a

2    substantial amount like maybe $111,000, the vehicles

3    and the boat.

4         Q.    That's why I took the money back off.

5         A.    Do what, now?

6         Q.    I sued MEG and they got repaid at the

7    same time that you did and I've already sued them

8    and collected what they were repaid.

9         A.    Well, there were two that were

10   substantial, but they apparently had been satisfied.

11   The third one was a relatively small loan of $6700

12   of which the collateral was the boat and maybe

13   $4,000 in cash.

14        Q.    Yeah.

15        A.    She had been making the payments for

16   seven months, so I haven't heard back from her.  I

17   would assume she's making the payments on that small

18   note.

19        Q.    Did you deal or have you talked before

20   or after the bankruptcy with any of the other people

21   who worked with Alpha?

22        A.    Chris what's his name.

23        Q.    Mullins?

24        A.    Chris Mullins I don't think I talked

25   directly to him, but I was told that maybe he was

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   being sued over some of his paychecks that he had

2   accepted.

3       Q.     Yeah, I sued him, that's right.

4       A.     But I don't think I talked to him

5   directly.

6       Q.     Anybody else?

7       A.     Not that worked with Jeff.

8       Q.     All right.  Anybody connected with Jeff?

9       A.     A good friend of mine, very good friend

10   of mine, a long time law enforcement -- fellow law

11   enforcement officer John Pike, he told me --

12       Q.     Yeah, I sued him too.

13       A.     He said Jeff came to him, "I need to

14   borrow $30,000."

15            And John said, "David, I did it as, you

16   know, as a brother in Christ, so to speak."  He was

17   doing the right thing.  He said, "Jeff paid me

18   back."  I mean, no interest, no nothing.  This was a

19   personal loan.  And he was like me, "Why are they

20   coming after me?"  But other than that, no.

21       Q.     Any of the other employees?

22       A.     No.

23       Q.     You don't know that Pike was not

24   employed but you said --

25       A.     I'm 99 percent sure Pike doesn't work

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                      **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    for --

2            Q.      For Brinson?

3            A.      -- Jeff, no.

4            Q.      All right.  Any other people you know of

5    who would know anything about Brinson, Alpha, or

6    this transaction?

7            A.      No, sir, huh-uh (negative response).

8            Q.      All right.  Number 6 says, "Please

9    identify all transfers of property made by Alpha

10   Protective Services to or for the benefit of the

11   Respondent, between April 2nd, 2010, and April the

12   12th of 2010."  I think we've been through all that.

13           A.      We have.  I've provided you all the

14   documentation, anything to do with him.

15           Q.      And have you discussed all transactions

16   that you've had with him?

17           A.      Say again.

18           Q.      We've discussed all transactions that

19   you had with him?

20           A.      That's correct.

21           Q.      During that timeframe?

22           A.      That's correct.

23           Q.      The next question we come to is

24   transfers of property made by Alpha to you.  We

25   talked about that too.  We've talked about every

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                      **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    dollar that you've got either from Brinson or either

2    from Alpha as a result of any of these transactions?

3         A.      That's correct.

4         Q.      There's no other transactions that we

5    haven't talked about?

6         A.      No, sir, there is not.

7         Q.      Do you have any knowledge or information

8    about the solvency of Alpha at the time that you got

9    paid?

10        A.      I did not.

11        Q.      You have none?

12        A.      Sir?

13        Q.      Do you have any information about the

14   solvency of Alpha at the time that you got paid?

15        A.      No, I knew nothing.

16        Q.      One way or another?

17        A.      No, sir.

18        Q.      You don't know whether they were solvent

19   or insolvent?

20        A.      I had no idea.  I assumed they were, I

21   guess.  I never really thought about it.

22        Q.      But you don't have any way to know?

23        A.      No, sir, I don't.

24        Q.      Because they were filing bankruptcy a

25   few days after that?

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        A.        That's what I now understand.

2        Q.        It's kind of hard to think that they

3    might be solvent?

4        A.        I just don't know.  I don't know what

5    his business practices were.

6        Q.        Have you ever had any other transactions

7    like this one where you advanced money to a company

8    to cover payroll and were repaid?

9        A.        You know, I don't know.  Most people

10   don't necessarily tell me what it's for.  Some do

11   but it's not a requirement.  Sometimes I ask,

12   sometimes I don't.

13       Q.        Yeah.  All right.  But you don't

14   remember having advanced payroll to anybody before

15   where you knew that's what it was going for?

16       A.        No, sir, not that I can recall.

17       Q.        Okay.  This is probably a silly

18   question, but do you know anybody -- do you have

19   anybody who's familiar with your industry who would

20   know whether or not it's common for you to make

21   loans in your industry to cover payroll?

22       A.        I mean, I can give you some references.

23               MR. OSMUS:  There's a pawn shop

24   association.

25       A.        Yeah, there's a national pawn broker

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    association.

2                      MR. WHITESIDE:  You don't have an

3    expert, do you?

4                      MR. OSMUS:  We actually -- no, maybe.

5                      MR. WHITESIDE:  Who?  That's one of

6    the interrogatories.

7                      MR. OSMUS:  Yeah.

8                      MR. WHITESIDE:  I'm sort of entitled

9    to know.

10                     MR. OSMUS:  Yeah.

11                     MR. WHITESIDE:  You're not going to

12   declare him yet?  You haven't declared him yet.

13                     MR. OSMUS:  No.  We haven't consulted

14   him.

15                     MR. WHITESIDE:  Well, if you

16   decide --

17                     MR. OSMUS:  Sure.

18                     MR. WHITESIDE:  --- you will disclose

19   him?

20                     MR. OSMUS:  Yeah.

21                     MR. WHITESIDE:  I'm not insisting on

22   responses to interrogatories.

23                     MR. OSMUS:  Yeah.  The pawn shop

24   association has a nation-wide retained counsel that

25   is a law professor and, you know, is available.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                          **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1                    MR. WHITESIDE:  Well, let's talk

2      about that.  If you do designate him as an expert,

3      I'm going to want to depose him.

4                    MR. OSMUS:  It's a she.

5                    MR. WHITESIDE:  That's fine too.  But

6      I'm going to want to depose her.

7                    MR. OSMUS:  Yeah.

8                    MR. WHITESIDE:  Where is she located?

9                    MR. OSMUS:  Indiana, I think.

10         A.      University of Indiana, she's a professor

11     or has a doctorate or whatever of law.  She

12     apparently has some specific background in pawn shop

13     laws, in particular as pertains to bankruptcies,

14     Sarah Jane Hughes.

15                   MR. WHITESIDE:  What I'm looking for

16     would be somebody who would be an expert on industry

17     standards.

18                   MR. OSMUS:  She hasn't consulted on

19     this case.  She's aware of it and I think she's

20     reviewed the pleadings but she's not aware of

21     anything.

22                   MR. WHITESIDE:  So you don't have an

23     expert on industry stands yet?

24                   MR. OSMUS:  No.

25                   MR. WHITESIDE:  And you will disclose

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    one and let me depose them?

2                      MR. OSMUS:  Absolutely.

3                      MR. WHITESIDE:  All right.  Good.

4      Q.      Do you have any basis to believe you had

5    a security interest in any collateral that Alpha

6    owned?  All the pawn tickets were in Brinson's name.

7    Do you have any information about any security

8    interest you might have had in collateral that Alpha

9    owned?

10     A.      Just what's contained in these

11   documents.

12     Q.      That's all Brinson, though, isn't it?

13     A.      Some of the titles were -- in fact, most

14   of the titles, I think, were in whatever APS.

15     Q.      But not in Alpha?

16     A.      I'd have to review them.

17     Q.      Take a look at them.  That's kind of

18   important.

19                     MR. OSMUS:  And the tractors, too, I

20   think you confirmed that they were owned by Alpha.

21     Q.      I think that would be part of this

22   cumulative Exhibit 5, towards the back of that stack

23   I think.

24                     MR. WHITESIDE:  Can we just agree

25   that you'll copy these two and send them to me or

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    send them to her and then she'll include them in

2    record?

3                    MR. OSMUS:  Yes.

4                    MR. WHITESIDE:  And I'm going to put

5    on the back side what the exhibit numbers are.  Do

6    you know how far I got?  This is 8 and 9, isn't it?

7                    COURT REPORTER:  Yeah, I think so

8    because you wrote those numbers.

9                    MR. WHITESIDE:  I'll just put 8 and

10   then 9 on the back.  I'll put it on the front

11   because that's how you copy it.  Okay, thanks.

12                   MR. OSMUS:  Okay.

13        Q.     I don't have any questions about them.

14   I do want to get straight on that.  That's kind of

15   the money shot here is to figure out who held the

16   collateral.

17        A.     You want me to answer?

18        Q.     Yes.

19        A.     Okay.  The documents I have, there's two

20   in the name of Alpha.  One is the John Deere Model

21   5045D tractor and the other one that is in the name

22   of Alpha for a John Deere 512 loader only.

23        Q.     What was the amount advanced on those?

24   Are those titled?

25        A.     Those are not titled.  Those are not

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                           **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   titled.

2       Q.     So what are you basing the conclusion

3   that they belong to Alpha on?

4       A.     Say that again?

5       Q.     How do you know that they belong to

6   Alpha?

7       A.     Well, I'm just basing it on what these

8   documents say.

9       Q.     Yes, which documents, though?  That's

10  what I'm trying to get in the record.

11      A.     Yeah, exactly.

12      Q.     Which documents?

13      A.     The document that shows a John Deere 512

14  loader.

15      Q.     These are bills of -- I'm sorry, these

16  are equipment invoices or bills of sale?

17             MR. OSMUS:  Yeah, bills of sale.

18      A.     Yeah.

19      Q.     Okay, got it.

20      A.     That one.  And then the other one that

21  is in Alpha's name is the John Deere 505D tractor.

22      Q.     Now, those are two bills of sale or

23  invoices or purchase orders?

24      A.     Correct.

25      Q.     That are part of Exhibit 5, right?

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1        A.        Correct.

2        Q.        What are those things worth?  What were

3   those things worth at the time?

4        A.        I probably allowed about 10,000 on the

5   John Deer 5045D.  Bear in mind it had a front-end

6   loader on it, also.

7        Q.        Yes.

8        A.        The other -- let me back up.  I probably

9   allowed 10,000 on that tractor and loader combined.

10       Q.        It's 10 or 20 are you saying?

11       A.        Sir?

12       Q.        It's 10 or 20 are you saying?

13       A.        10,000 on that one tractor that had

14   attached to it that loader that in --

15       Q.        What about the other tractor?

16       A.        That would have been more because it was

17   a four-wheel drive, probably about 15,000 on that.

18       Q.        25,000 total?

19       A.        Sir?

20       Q.        25,000 total?

21       A.        About.

22       Q.        I'm sorry, I don't want to interrupt

23   you.  Go ahead.

24       A.        You go ahead.

25       Q.        No, you're the witness.  I learned about

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                        229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1    20 years ago not to interrupt witnesses when they

2    are looking for information.

3         A.    I allowed about 10,000, like I said, on

4    that first one, that had the front-end loader

5    attached.  The four-wheel drive tractor that had a

6    front-end loader on it, I allowed 15,000.

7         Q.    And what are you looking at now to get

8    that?

9         A.    My notes where I went back in the

10   computer today to see what --

11        Q.    Can I see those notes?

12        A.    Yeah, correct.

13        Q.    Where is it?  I see it, got it.  Do I

14   have this on my copies?  He may have added this

15   after you copied it.

16             MR. OSMUS:  I think so.  I don't

17   know.

18        A.    You don't.

19        Q.    Okay.  Listen, I don't want to crowd the

20   record with that.  You've told me what it says.  I'm

21   reading it and I'm satisfied that's what it says.

22   And you put a value on the boat at 30,000?

23        A.    No, sir.

24        Q.    See if that -- I thought that's what it

25   says.  Am I wrong about that?

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    *229-382-8512*

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      A.      Let me see.  The boat was 17,000.

2      Q.      Let's see.

3      A.      These are codes for me that, I mean, I

4   don't mind putting them in numbers, but that code

5   stands for 10,000, that code stands for 15,000, that

6   one for 17,000.  These numbers that you see out here

7   are approximately what they would have easily sold

8   for.  And then there's one more item on the next

9   page.

10     Q.      There are no notes on that.  Is there --

11     A.      Should be.

12             MR. OSMUS:  4,000 for the trailer.

13     Q.      I'm sorry, I skipped over it.

14     A.      4,000 for the trailer.

15     Q.      So of the collateral that you took, the

16  only collateral that really belonged to Alpha was

17  the two tractors, which your testimony is that that

18  total value was about 25,000?

19     A.      One of the tractors, if I remember

20  right, was in Jeff's name.  There was only two of

21  those receipts that showed Alpha.

22     Q.      That's what I saying.  That's why we did

23  that.

24     A.      We did, but that was -- I allotted

25  10,000 to that as far as the collateral.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      To those two tractors?

2          A.      No, sir.  There were three tickets.

3    There was one -- there was two for two tractors

4    individual.  There was a third ticket for a

5    front-end loader, which was probably the one

6    attached to that first tractor.  And those were the

7    only two items that actually were titled in the name

8    of Alpha.

9          Q.      Now, this has them lumped together.  It

10   has "tractor: Other:  John Deere" and it has on here

11   with 512 front-end loader?

12         A.      Yeah.  The front-end loader represented

13   by that sales receipt was attached to -- he had it

14   attached to the tractor.  When he delivered it to

15   me, they were.

16         Q.      Got it.  So is the 15,000 a value for

17   both of them?

18         A.      No, sir.

19         Q.      Let's get this cleared up in the record.

20   We're referring now to 1235 -- to loan number ending

21   3538, which is part of the cumulative exhibits.  And

22   you have here two tractors here with, as you say,

23   your notes on it.  One of them is MTXXX.  The other

24   is MOTXX?

25         A.      No.

**Mixon Reporting Service, Inc.**

**Albany  - Tifton - Valdosta**                                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.      I'm sorry, MPTXX, I've got it.  And then

2    you've out to the right of that as you hold the

3    document 15 and 20.  I understood that 15 is what

4    you would sell it for and the 20 is what you would

5    sell it for?

6          A.      That's correct.

7          Q.      Now, explain to me.  What is the value

8    we're talking about here?

9          A.      The loan value, the amount that was

10   allotted to this item, which is the John Deere 5045

11   with the front-end loader attached was $10,000.

12         Q.      And the next loan value?

13         A.      That's the four-wheel drive John Deere,

14   which also had a front-end loader attached, I

15   allotted 15,000.

16         Q.      All right.  And those two items are the

17   only two items of collateral that Alpha actually

18   owned?

19                 MR. OSMUS:  Or that you can tell from

20   the documentation.  You don't know who actually

21   owned them.

22         A.      I don't know who actually owned them.

23   From the documentation, this is the only one in the

24   name of Alpha.

25         Q.      Just the one?

**Mixon Reporting Service, Inc.**

**Albany - Tifton - Valdosta**                          *229-382-8512*

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          A.        Let me look again.

2          Q.        Yeah, sure.

3                    MR. OSMUS:  Part of Exhibit 5, it's

4     all on the subject.

5                    MR. WHITESIDE:  If you find

6     additional documents, I'll assume you will supply

7     them to me, but I'm relying on these documents for

8     the time being.

9                    MR. OSMUS:  There's no registration

10    for -- for clarification, there's no way to register

11    an off-road vehicle.

12                    MR. WHITESIDE:  I don't think so.

13                    MR. OSMUS:  I mean, there is none.

14    You can check the UCC record to see if there's a

15    lien.  What he's provided as a response to the

16    interrogatory is the invoices of the person that

17    purchased them, which was his best indication at the

18    time, I think, which is our explanation for

19    providing those.

20          A.        Where the confusion, I think, comes in

21    is although that first item on that ticket --

22          Q.        Ticket number?

23          A.        -- 3538.

24          Q.        Yes.

25          A.        That includes items listed on two of

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    these sales receipts.

2        Q.    Okay.  So the only collateral that you

3    know you got from Alpha, that you're sure you got

4    from Alpha is the first one here?

5        A.    That's correct.

6        Q.    And that's worth how much?

7        A.    Retail at the time was about $15,000.

8    What I allotted was $10,000.

9        Q.    Okay.  And you have no other documents

10   that would show who the owner of any of the

11   collateral was except for the ones we just talked

12   about?

13       A.    That's correct.

14       Q.    Okay.  Alpha didn't sign any of the pawn

15   tickets either?

16       A.    No.  Jeff Brinson signed them.

17       Q.    Let me ask you this, and this is not

18   really a hypothetical, but can I pawn somebody

19   else's property?

20       A.    You can with their permission.

21       Q.    How do you establish permission?

22       A.    How would I establish, or how would you?

23       Q.    How would you?  You're the one making

24   the loan.

25       A.    That would be the responsibility of the

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                          **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1   person that's pawning the item.

2        Q.      What would you consider to be

3   satisfactory documentation?  If that person were

4   pawning somebody else's property, what would you ask

5   them to provide?

6        A.      I don't know that I've ever been told by

7   anybody, "Hey, I'm pawning somebody else's

8   property."  When they sign the pawn ticket, though,

9   part of the contract they're pledging that it is

10  their property or their property with all rights to

11  pawn it.  How enforceable that is, I don't know, but

12  it's on there.  That's what they're signing.  That's

13  what they're acknowledging.

14       Q.      So you're not aware of a situation where

15  you had somebody pawning an asset -- in your

16  practice, your business history, you're not aware of

17  anybody who admitted that they were pawning a piece

18  of property belonging to somebody else?

19       A.      I don't -- I don't think so.  I may have

20  had a customer say, "I'm pawning this for Phil

21  Pacheene, my husband."  That's not that uncommon, a

22  husband and wife and they're regular customers.

23  And, "Phil wanted me to come by here and pawn this

24  for him."  And I guess in the state of Georgia who

25  knows who owns what anyway.  But not that I know of.

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                        229-382-8512

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.        Now, this is not a hypothetical but it's

2     an actual fact pattern.  I have got a good friend

3     that I haven't seen him in years, but a friend in

4     Columbus who is an antique dealer.  And I have done

5     a little legal work for him over the years, but he's

6     kind of a scoundrel.  I mean, a nice guy but kind of

7     a scoundrel.  You know the type.

8          A.        Uh-huh (positive response).

9          Q.        But he pawned some silver that belonged

10    to somebody else and he went to prison for that.  Is

11    that something that's unheard of?

12         A.        It would be unheard of in my industry if

13    you do it by law.  We're regulated by state law.

14    They have to provide us with a government-issued

15    photo ID.

16         Q.        That's not what I mean.  But I'm

17    interrupting you because I think I'm misstating the

18    question.  The person who made the pawn was the one

19    who went to prison.

20         A.        Yeah.

21         Q.        Not the pawn shop owner.

22         A.        Yeah.

23         Q.        He took some silver that he had taken on

24    consignment in his antique store and he just pawned

25    it and kept the money, he didn't tell the person.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                          229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    And he went to prison over that.  Is that uncommon?

2         A.      Percentagewise, yeah.

3         Q.      That does happen?

4         A.      We pursue it diligently.

5         Q.      So it's not a good thing when somebody

6    pawns something that belongs to somebody else?

7         A.      You know what, it depends on your

8    perspective.  And it's been debated in the industry.

9    Let me tell you what we do.  If we have suspicions

10   that it's not legitimate, we don't try to be heroes.

11   We'll go ahead and pawn it because we've got

12   incontrovertible evidence at that time.  We

13   immediately call law enforcement.

14           We just did that just a few minutes ago.

15   And while I may lose some money in the deal, $100,

16   $200.  My premise is, if that's what it takes to see

17   a bad guy go to jail, because I know what the cost

18   of an investigation is, we'll buy it.

19        Q.      When you pawn something that's not

20   yours, that's kind of criminal conduct, isn't it?

21        A.      Yeah.  It all comes down to intent.

22        Q.      Right.  So like my guy that went to

23   prison shouldn't have gone to prison?

24        A.      No, I thought you were talking about a

25   pawn broker.

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                          **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1          Q.        No.  I'm not blaming --

2          A.        Are you talking about the person that

3     pawned it?  Yeah, they should go to prison.

4          Q.        So if you walk into a pawn shop with

5     something that belongs to somebody else, that's a

6     bad thing, right?

7          A.        It's illegal.

8          Q.        And you go to jail for that?

9          A.        You can.

10          Q.        Now, if somebody walks into your pawn

11     shop and they pawn something that belongs to

12     somebody else, can that somebody else come get it

13     from you?  Do you have the right to insist that the

14     real owner has to pay the ticket off?

15          A.        Not if we haven't any notification from

16     law enforcement.  If the original pawner comes in, I

17     think that's what you're describing, can he redeem

18     it?

19          Q.        No.  If the original pawner comes in and

20     he pawns a sale like my friend Pat, not friend but

21     former client, haven't seen him in years, but he

22     pawns $5,000 worth of antique silver?

23          A.        Okay.

24          Q.        It's not his?

25          A.        Okay.

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      Q.      All right.  But you were satisfied for

2    whatever reason that it's his and so you give him

3    the money, you haven't done anything wrong?

4      A.      Correct.

5      Q.      I'm not saying the pawn broker has done

6    anything wrong, that's not my point at all.

7      A.      Correct.

8      Q.      But my friend Pat, he did, let's say he

9    did.

10     A.      Uh-huh (positive response).

11     Q.      Now, if the true owner of the silver

12   comes in, are you entitled to make them pay the pawn

13   ticket before you give them the silver back?

14     A.      No, no, I'm not.  Matter of fact, my

15   first question, then, would be:  Have you made a

16   police report because that's --

17     Q.      Assuming all that.

18     A.      We would turn it over to the police for

19   evidence.  I wouldn't turn it over to the

20   individual.

21     Q.      But you wouldn't be entitled to make

22   that individual pay the pawn ticket?

23     A.      No, sir, no.  We're at the mercy of the

24   courts.

25     Q.      So because the stuff that you took the

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                                    229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1   person who pawned it didn't have good title to?

2        A.      That's correct.

3        Q.      So you can't pawn what you don't own?

4        A.      Not without permission.

5        Q.      Okay.  Permission would be a power of

6   attorney, something like that?

7        A.      Right.

8        Q.      Assuming you don't have permission like

9   a power of attorney or a board of resolution or

10  something, you can't pawn what you don't own?

11       A.      You shouldn't.

12       Q.      You're not going to say you can't?

13              MR. OSMUS:  You're asking him to make

14  a legal conclusion here, I think.

15              MR. WHITESIDE:  He's testified a good

16  bit about his knowledge of practices in his

17  industry.  I'm not asking him a legal question.

18       Q.      I'm just saying:  Practice in your

19  industry, can you do that?

20       A.      Say it again, what is it?

21       Q.      Somebody walks in and they pretend to be

22  the owner of the item but they are really not the

23  owner of the item and they're not authorized by the

24  true owner to pawn it.  They can't pawn it, can

25  they?

**Mixon Reporting Service, Inc.**
Albany  - Tifton - Valdosta                    229-382-8512

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1      A.      They can.

2      Q.      Okay.  Is your pawn -- are you then

3  entitled to keep the pawned stuff?

4      A.      Not if it's evidence of a crime.

5      Q.      But you're not entitled to keep the

6  pawned stuff?

7      A.      I've got a valid legal interest in the

8  items.  Now, it can be overridden by somebody else,

9  by the decision of a judge, for example.

10     Q.      The owner?

11     A.      Not by the owner, it would have to be a

12  judge.

13     Q.      Have you ever had anybody come in and

14  make a claim on something that they owned that

15  somebody else pawned?

16     A.      Sure.

17     Q.      What do you do?

18     A.      Ask them have they made a police report.

19     Q.      And if they say, "Yeah, I made a police

20  report," then what do you do?

21     A.      I just tell them to have the detective

22  get in touch with me and we'll handle it.

23     Q.      And then when he does, what do you do?

24     A.      If he says it's evidence of a crime, we

25  turn it over to him, but we get proper documentation

**Mixon Reporting Service, Inc.**
**Albany - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
courtreporter@mixonreportingservice.com

1    from him and ask him to include us as a victim and

2    get restitution if you can, which is a pipe dream.

3         Q.    Give him a property receipt?

4         A.    Correct.

5         Q.    But you don't get to keep the stuff?

6         A.    Oh, no.  I turn it over to him for

7    evidence until it's -- you know, the case is over.

8         Q.    After it quits being evidence, do they

9    give it back to you?

10        A.    They could if a decision hasn't been

11   made by a judge that it belongs to somebody else.

12   Ultimately I don't get to decide.  The police don't

13   get to decide either.  The judge does.

14        Q.    I thought you said the judge decides if

15   the stuff belongs to somebody else, you don't get it

16   back, do you?

17        A.    No; no, sir.

18        Q.    Have you ever had an instance where you

19   got the stuff back?

20             MR. OSMUS:  I think he's answered

21   this about five times, Fife.

22        A.    I have, yes.

23             MR. WHITESIDE:  He's answered only

24   twice.

25        Q.    When was that?

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**

**Deposition of David Hufstetler, taken  on 9/16/2015**
courtreporter@mixonreportingservice.com

1       A.      When it turned out there wasn't a crime

2   at all.

3       Q.      Got it.  That's the only time, then?

4       A.      Probably, yes.

5               MR. WHITESIDE:  Okay.  I think I'm

6   about done.  We need to talk a little bit about the

7   exhibits.

8               MR. OSMUS:  We need to get you copies

9   of those.

10              MR. WHITESIDE:  Yes, send them to

11  her.  I need the transcript.  I'm ordering it now,

12  so just figure on doing the transcript.  And if

13  you'll send it to her, she'll send it to me.  I

14  don't need to walk out of here with it.  Did you

15  have anything you wanted to ask him?

16              MR. OSMUS:  No.

17              MR. WHITESIDE:  Let me double check

18  the interrogatories and make sure I've got

19  everything.

20      Q.      I do want to ask him -- tell me again

21  who are -- I think I asked you this and you answered

22  it.  And I'm not bugging you, I just don't remember.

23  But who are the owners of American Pawn?

24      A.      I misspoke a while ago.  I now own

25  66-2/3 percentage and my younger brother Marty owns

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                              **229-382-8512**

**Deposition of David Hufstetler, taken on 9/16/2015**
**courtreporter@mixonreportingservice.com**

1    33-1/3 percent as of about a year and a half ago.

2         Q.    Where do you have offices?  Do you have

3    offices in more than one place?

4         A.    We do, five towns.

5         Q.    Where are they?  I don't need the

6    addresses.  I just want to know the towns.

7         A.    Thomasville, Cairo, Bainbridge,

8    Moultrie, and Americus.

9              MR. WHITESIDE:  Okay.  I'm done.

10             (Whereupon, neither the deponent nor any

11   party having specifically reserved reading and

12   signing of the deposition, signature was effectively

13   waived and the taking of the deposition was

14   concluded at 5:25 p.m. the same date.)

15

16

17

18

19

20

21

22

23

24

25

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                                    **229-382-8512**

Deposition of David Hufstetler, taken  on 9/16/2015
courtreporter@mixonreportingservice.com

1                       C E R T I F I C A T E

2     STATE OF GEORGIA,

3     COUNTY OF TIFT:

4               I hereby certify that the foregoing

5     transcript was taken down, as stated in the caption,

6     and the questions and answers thereto were reduced

7     to typewriting by computer-aided transcription under

8     my direction; that the foregoing pages 1 through 82

9     represent a true, complete, and correct transcript

10    of the evidence given; and I further certify that I

11    am not of kin or counsel to the parties in the case,

12    am not in the regular employ of counsel for any of

13    said parties, and am in no wise interested in the

14    result of said case.

15              I further certify that the original of

16    this deposition will be filed with Fife Whiteside,

17    Esquire, Counsel for the Debtor.

18              This the 15th day of October 2015.

19

20

21

      _____
22    GAIL H. BEARD, CCR-B-861
      Notary Public
23    My Commission Expires 05/23/2019

24

25

**Mixon Reporting Service, Inc.**
**Albany  - Tifton - Valdosta**                    **229-382-8512**